Lone Star Distillery, Incorporated v. Lone Star Distillery Okay, Ms. Greer. May it please the Court, my name is Marcy Greer and I represent Allied Lomar, the trademark owner and plaintiff appellant in this case. This case is about trademark abandonment. Allied went to trial on an infringement claim and ended up with an abandonment finding that risks, not just risks, takes away its trademark forever. Allied had this trademark for 27 years. It sold lots of product, 9,000 bottles, before trial. I mean, not before trial, but up to the date that the sales stopped. What do you do with the jury finding of no likelihood of confusion here? I think that stands alone. There are two ways to answer that, Your Honor. You can look at it as the invalidity defense of abandonment, which was, by the way, pled both as an invalidity defense and a counterclaim for cancellation. And there were three invalidity defenses raised to the jury. The instructions which came first instructed the jury to find a valid trademark in order to find likelihood of confusion. So of the three invalidity defenses, the only one the jury found was abandonment. So the jury could have read, presumably would have read, that abandonment instruction to apply to the invalidity of the trademark and the likelihood of confusion. So we believe that the jury would have answered that question, no, based on the invalidity of the trademark through abandonment. But even if the court is not convinced of that, the abandonment finding stands alone. As I mentioned, there was a counterclaim for cancellation based on abandonment. And the trial court, the district court, made a specific declaration in the final judgment that the mark has been abandoned and is therefore invalid. Those are his words in the judgment. So even if the court disagrees that the likelihood of confusion argument was prejudiced by that, the jury finding, the court could reform the judgment to excise out the abandonment finding because there is no evidence of an intent not to resume use. The only evidence, 100 percent of this evidence, and it's not just Ms. Palatella's testimony. There are evidences of her going to trade shows, her setting up appointments with potential customers, importers, distributors, et cetera, for sales. She was constantly sending out price lists and marketing this product throughout the entire period, from the very beginning in the late 1980s, early 1990s, all the way through trial. That conduct didn't change. She was actively using that mark, sending out those price lists, sending out the product. This was an interesting industry. Is there any evidence in this record of sales of the Cowboy Little Barrel after 2009? No, not until 2014. But the problem there was that there was no inventory because this is a very rare industry. It's a very unusual industry. Usually you create your product and then you get the demand. This is done in the reverse. You go and get the clients, the customers, and then look for the batches. She was constantly looking for batches to have them, but they were very rare. And in the record are numerous articles about the shortage of rare aged bourbon. Those are from years later, the articles in the newspaper. They reflect what was going on at the time period. Reference to present problem, which would have been years after you're alleging she was looking for the rare bourbon. She testified that she was running into that problem starting in 2009, in that time frame. She was not able to get them. Allied was at a little bit of a disadvantage here because it's a small shop, and they don't have the market power of some of these large names that can go get the batches when needed. So if there is a pecking order to try and get these small batches, which are rare and hard to find, and by the way, it's all based on relationships, and so she had some strong relationships, but then when you bring someone with a lot of market power, they had a better shot at getting it. The only evidence in the record contrary to that is Garrison's testimony that bourbon was generally available, but he's not talking about rare aged small batch lots of this bourbon, and that's what she sold. And the suggestion that this was cheap bourbon is just not supported by the record at all. The price lists show that it was expensive. It was hard to find, and there's a very, very limited clientele that will purchase it, but that is not reason to take away the mark. The mark is designed to protect entrepreneurs as well as large companies. So expensive meaning how much per ordinary bottle? There are offers to sell for $1,900, and there's some price lists, which would be more on a wholesale level anywhere from $180 to $250 and up from there. What was the listing at $8 and something and $9? Council was, I believe, doing some math from some invoices and things, but that's not what the record shows. This was very expensive bourbon, and only certain types of purchasers and collectors were interested in it. But the trademark law protects. Where are these batches of bourbon out there? If they're aged, by definition, they've been in place for somewhere for a long period of time. So I have this mental picture of people running around trying to find a cache of aged bourbon. I find that very difficult. Well, Your Honor, there are distilleries mostly in Kentucky. That's where most of these are, and that's where Allied has its relationships with some of the old, old Kentucky bourbon families that have these. And they do. They'll make a specialty lot and age it and put it aside. It takes a very long time for it to age properly, and these lots were 12, 20, 25 years old. So you can't just make them overnight. And so that was why the trouble getting it. But that's really— I was suggesting to you if these families have got these stashes of bourbon, they're very locatable, and the people know exactly where they are. I have this picture. You're not mining. People have the bourbon in their possession, and they've had it for a year or so, and they know what its value is. I just have a difficult understanding of this market and what people—you're not searching for this particularly. I get the picture that you're searching for a ton of bourbon, and then you characterize it at a very high price. But could you help me a little bit with how the market works? Sure. I think it's the aging process that takes the time because it's not available until it actually ages out to that level. So, yes, they will have to learn about it. And these are well-kept secrets. I mean, the alcohol industry is notorious for keeping everything close to the vest. You have to develop these relationships to find this information. But the reality is the uncontested evidence is she couldn't get the supply. Allied just couldn't get the supply, and the law does not penalize trademark owners who are marketing their product and trying to sell it from doing that. In fact, I mean, they really equate here sales, the lack of— How do you know the bourbon is that old? I don't know. That's what it says it is. Well, a lot of it has to do with the professionalism of tasting. That's a practiced art that they can taste a difference in the aging of the bourbon. And so what you're paying Allied for is that expertise, that personal touch of being able to identify and discern which batches are appropriate. And, you know, it's also possible that batches aren't any good, even though they've aged the appropriate amount of time. You have to go and taste them and make sure that it's the product that you want to sell under your label. When was the last time your client actually sold a bottle of what you're referring to as rare old whiskey? In 2009. Right. That's a problem. It's a problem, but the law protects against both use and plans to resume use. It's a two-part test. It's not just use in the market. It's also you have to have credible plans to return to use. Preparation for use has to be supportive of some sort of objective manifestation of that. Otherwise, there's no such thing as abandonment. You could say, well, I plan to resume someday and 15 years go by. If I ever find that right batch, I'm coming back. I'm suggesting to you that abandonment requires some sort of objective manifestation while continuing to attempt to resume. Would you agree with that? Absolutely. Absolutely. And here we have those steps. This case is unlike Exxon, where it was just a token use. And, frankly, Exxon was a use case, not an intent case. An intent is very different. We're not resting here on the bold assertion. You talk about Exxon and old whiskey. I was going to ask you, their grades aren't exactly old. No. But in that case, again, that was a case of use, not intent. Intent means the intent to go back. It means that you don't want to just give up and leave the mark altogether. And there's no evidence anywhere near this. In fact, the reason that Allied found Garrison was because they were in the process of redesigning their label so that they could find a better market for it. And so those kinds of steps are the kinds of things that reasonable, objective businessmen would take in order to promote and sell the mark. And the fact that the product is not available due to circumstances outside their control, that's not relevant to the intent question as long as the steps are being taken. I think what the trial court did here was equate steps to acquire the product with steps to use the mark, and they are not the same thing. The statute only requires steps to use the mark. You can't use the mark without the product, so that doesn't really make sense. Well, you can advertise and sell. If you have something to sell, otherwise it's bad faith. It's fraud. It's trying to sell something that's not in existence. It's a lot easier to convince a supplier to sell you the lots if you have a willing buyer. That's the way this market works. That's one of the reasons that inventory is not traditionally kept. A lot of inventory is not kept on hand. It's because they typically create the demand first and then go back to at least that's the way that this business model has worked. But real customers don't buy things that don't exist unless there's really a problem. So I don't know. I mean, I see what you're arguing, but it doesn't make a lot of sense. Well, it's not a question of it not existing. It's a question of needing to get it. It's kind of like an option contract. Well, it didn't exist, did it? Well, it's not in the possession of Allied at the time that the price lists are offered. What it is, you don't want to buy it and resell it. What you want to do is to have a buyer and broker it, essentially, is one way of looking at it. I think you can look at it any number of ways, but it is a business model that is legitimate and has been successful over the years. There's no basis for taking away the mark just because they were not able to. How long will this mark go? If you had no sales for 25 years, that would not matter. As long as you say, well, I'm still waiting to, if we ever find something out there, then we will acquire an option on it and then we'll sell it. Well, I think the facts are, the cases are. I understand that. I'm not suggesting that the facts here. I'm saying what do you do with that factual circumstance? I'm trying to test your theory. You have to look at all the different circumstances of the case and how the product is sold and what is going on there. If someone is just warehousing the mark so that maybe if a certain product is invented in the future or maybe a certain product that hasn't even been brought to market becomes available, that is a very different case from here where these lots are available to someone who can get them, but it's a kind of back and forth process. And the fact that there's vagaries in the industry shouldn't be a reason for punishing our client. They focus on, I mean, if you look at the Defiance Button case, one that we cited in here, the business ceased its operations and sold its assets, but it intended, it was engaged in negotiations to resume that business under the same trade name, and that was found to be enough. The Emergency One v. American Fire Eagle case we talked about, they rebutted the presumption of abandonment because there was, promoted the mark through T-shirts. This was the case involving the fire engines and the American Eagle superimposed on the American flag. How many unused brands did your client have? I think all of them are in use, Your Honor. There isn't a lot of testimony in the record, but Allied Lomar has a number of brands that it markets, and there's price lists that go on and on as well as invoices. That are currently on the market? Yes. Are they customers? Are they being sold? My understanding is they are. My understanding in the record is that Allied is warehousing hundreds of unused brands, that the first price list contains 625 separate liquor brands. The last list dated 2013 contains 1,670 different brands, and you emailed those overseas when you had none of those to sell. I think warehousing is an unfair characterization. The product is being sold and marketed. It's not being warehoused. Warehousing is if you're just trying to protect it to keep someone else from using it. Well, you're holding it and you're not selling it. You can describe it as warehousing or not, but that's what it is. Warehousing implies that you have this inventory of all these brands there, and then if you find something to sell, you'll sell it under that brand. I thought that was what the evidence produced. No, Your Honor, there wasn't much evidence at all of the other brands. This was focused on the Cowboy Little Barrel brand, and the evidence was that there was continuous attempts to market it, and there have been lots of products sold, but the last batch, the $90,000, was sold in 2014, which the trial court cut out, and I'll save the rest of my argument for rebuttal. Yes, you have saved time for rebuttal, Ms. Guerra. Thank you. Mr. Kennedy. Good morning. Pete Kennedy on behalf of Garrison Brothers Distillery. Your Honor, this is a classic case of trademark hoarding or trademark warehousing. I represent a small distillery in Texas that actually makes bourbon and released a particularly special bourbon in 2013 that Dan Garrison named Cowboy Bourbon. He was then surprised to be sued by Allied Lomar, claiming that he was infringing their trademark for Cowboy Little Barrel bourbon, and when he researched it, he found that Cowboy Little Barrel had never been sold in the United States at all for consumption. The only sales of this product were overseas, and the last sale, as the court has noted, was for overseas consumption and made in the year 2009, at least according to the invoice records that were submitted at trial. Looking at those invoice records, the prior sale before 2009 was in 2006, and then any of the sales of Cowboy Little Barrel were before that, and again, all of these were overseas. Now, the invoices were literally the only evidence of sales in the record at all. They were electronic. All of the other records, as Ms. Palatela testified, had been shredded. There were none of the records you would typically see in the sale of alcoholic beverages, such as receipts, bills of lading, or tax receipts. But even assuming that those electronic invoices reflected real sales, it's easy to look at the invoices and to see the price. I did calculate the per bottle price, but based on the invoices, which show the number of bottles and the price, the price for this bourbon ranged from $8 to $12 a bottle. There is one unauthenticated exhibit in the record showing a picture of the bottle being offered online by somebody with a $1,600 price. Ms. Palatela admitted at trial she had no idea whether that was actually being sold or whether anyone had actually bought that product at that price. She also mentioned, what did she say, $160, $180? I'm unaware of that, Your Honor. Cowboy bourbon, my client's product, retailed for $200 a bottle. But I don't believe there's anything in the record to show that there were any sales of Cowboy Little Barrel at that price. The invoices that the plaintiff itself introduced showed the $8 to $12 price. Now, the law actually deals with this issue fairly straightforward on abandonment. The first issue is if there is a period of three or more years of non-use of a trademark, then the trademark is assumed to be abandoned. That was the case here. We had at least two periods that the jury could reasonably conclude were periods of non-use. From 2009 until the time of trial, when the lawsuit was filed in 2014, or from 2006 to 2009. But you could have plans to resume use despite a three-year gap, isn't that right? You could. That's correct. The three-year gap creates a prima facie case of abandonment, which then puts the burden on the trademark owner to come forward with real evidence of an intent to resume use of the mark. And it doesn't qualify, as the judge wrote in Exxon versus the Humble, it doesn't qualify just to come and testify, I intend to resume use. But you have to show actual plans to resume the use. And the evidence has to show that intent not later, not after you file a lawsuit against somebody and you try to show that you're still using the trademark, but at the time of the periods of non-use. So what the plaintiff needed to come up with here was evidence during those three-year periods, from 2006 to 2009, to show that they had the intent to resume use. And use isn't just sending out huge price lists in the hope that somebody will bite on the hook and decide to order a particular product with a particular name. But it has to be a bona fide use in commerce, not simply to reserve the mark. That's the language in Section 1127. And so if you have what we have here, which were price lists of 1,600 products and 143 brands of bourbon alone, these are not price lists that emphasize Cowboy Little Barrel. These are not advertisements that push this particular product. These are enormous price lists with a bunch of names on them. And the jury could reasonably conclude that what the business model here was, that the plaintiff was hoarding a huge number of brands, marketing them to unsophisticated foreign consumers, unaware of American bourbon and American bourbon traditions. And if the foreign consumer liked a particular brand, Cowboy Bourbon, Cowboy Little Barrel, that sounds cool. Got to note that they were selling it to Japan and Germany, two countries who were sort of very interested in the American myth of the West. And so Cowboy Little Barrel might be interesting bourbons to German and Japanese consumers. The model would be then if you got the order, then they would go back and try to find bourbon to fill the order. And Ms. Palatella made an interesting concession in her testimony, which is when I asked her where does it come from, she testified they purchased from one distillery she would not disclose the name of, and then they shifted to a second distillery she also would not disclose the name of. But she said sometimes we know where the bourbon comes from and sometimes we don't. And the sometimes we don't means she is buying essentially unknown lots of bourbon, putting them into bottles and then labeling them with specific years. The jury could reasonably conclude that what's going on here is she is buying whatever bourbon she can find, putting it in bottles and then shipping them overseas in order to avoid U.S. labeling laws, which are very strict about years. I asked Ms. Greer about the jury finding of no likelihood of confusion, and she said that the abandonment finding stands alone. My question is, is the jury finding no likelihood of confusion, which I think they did not challenge in the district court, but whether that's true, is that enough for us to affirm or is there some reason to address the abandonment issue separately? A little of both, Your Honor. The failure to challenge no likelihood of confusion is sufficient for the court to affirm the dismissal of the infringement claims against my client. That was an essential element of the claim. The jury found in question number one against that claim, and that is unchallenged on appeal. The abandonment question played two roles. It was an affirmative defense against the claims of infringement, but a jury finding or a court finding of abandonment can also be used to cancel a federal trademark registration. And so we had a counterclaim for abandonment as well as two other counterclaims challenging the registration. So question one was likelihood of confusion. Question two and three were two theories we had that would have, if they had gone in our favor, resulted in cancellation of the mark. We lost those two. And then the fourth question was abandonment, which serves to defeat a claim of infringement. But if a trademark is abandoned and a court enters that judgment, then the USPTO will enter cancellation of the mark. And I believe this is in the record that that registration has been cited against my client in its effort to register Cowboy Bourbon trademark. That has been an obstacle in getting our trademark registered. And so a finding of abandonment would allow the USPTO to cancel the mark and then remove the obstacle to our registering our trademark. So even if the court decides that they have waived their appeal on the affirmative claims of infringement against us, I do believe the court needs to reach the abandonment issue on our counterclaim so that the question of whether their trademark registration should be canceled based on the finding of abandonment gets decided. I have a long answer to that, but the truth is, yeah, as the counterclaim does. I want to briefly address the question that's been raised and seems to be one of their themes, is the idea that the trial judge excluded evidence of a later product, which the claim is that somehow shows somehow evidence of an intent to resume use during the period of abandonment. And I think this is fairly well briefed, but there's multiple problems with that. The first is there was no exclusion of evidence at all. The ruling that the trial judge entered was on a motion in limine, which required the party simply to approach the bench before introducing this new product. Was the court advised as to what the evidence would be? Not by the plans. It was, to some degree, in my motion in limine, so there was no profit. And, in fact, the motion in limine shows that the later product did not use the Cowboy Little Barrel brand as the name when it was released. It was simply called Cowboy. And it wasn't bourbon. It was a blended whiskey. And neither of those things satisfied the trademark registration, which was limited to the three words Cowboy Little Barrel in the product category bourbon whiskey. But Judge Sparks knew that when he ruled on the motion in limine? Yes. Yeah, that was attached to the motion in limine. And so the exclusion of evidence was not incorrect. And then there is a minor issue that was raised about the jury instructions discussing abandonment and then what the plaintiff's burden is to rebut the prima facie case of abandonment after a three-year period. The plaintiff, I think, quibbles with the fact that the instruction required the plaintiff to come forward with actual concrete plans to resume use. They object to the word concrete. There were Fifth Circuit district court cases that used that exact phrase. That's where it came from. There was no objection lodged to that instruction at the time. I still believe it's correct. And in any case, concrete simply reinforces the idea that the evidence can't be a subjective assertion by the trademark owner, that someday I plan to use this in the future. But there has to be something, as Judge Higginbotham noted, tangible proof that there is an intent to resume use, not just a hope that someday there might be a reason to roll out the product. So unless the panel has any further questions. All right. Thank you, Mr. Kidd. Great. Thank you. Thank you, Your Honor. Let me first address the concrete plans. That issue is not just in the jury charge. It's also in the order denying the JMOL. That is the standard that Judge Sparks applied. And the Second Circuit originally said that in Silverman, but then it backed off when it realized district courts were misinterpreting what the standard was. The intent to resume is different from the actual use. And the standard to have concrete plans, designs to get back out there, is not the standard. It's designed to be much more flexible than that. The Second Circuit recognized that in two different cases, both the ITC case and the IMPRESA case that we cite in our papers, and said this is too high a standard. It's much more flexible than that. What we want is corroborating evidence of an intent to resume, not just the testimony, when I go to Greece, I hope to get better so I can return and resume my business, but concrete steps. Let's talk about actual steps or actual corroboration. Why is it actual concrete? I misspoke when I said actual. It's steps. And steps is meant to be read flexibly, according to the Second Circuit and the other cases. There's not a circuit court level case that has adopted that standard, but it keeps getting perpetuated through some of these district court cases. Here, the corroboration was a lot more than just sending out mass price lists. There is testimony. There are e-mails going to individuals, because this is how this product was sold. They would set up meetings with distributors in California. This whole idea that this was only sold overseas is a misnomer. The jury found it was used in U.S. commerce. The testimony was that it was sold from Kentucky to California. It was eventually sold to consumers overseas, but that's because that's where the demand was, and they have a right to sell the product. That's where you marketed to, right, the Germans and the Japanese? There was marketing to that. There was marketing in the United States. Allied went to trade shows here. It set up personal meetings. This is all in Ms. Palatel's testimony and the evidence that was introduced through her. These are significant demonstrations of an intent to continue use of the mark throughout the entire time period. As to the likelihood of confusion finding, the abandonment, the suggestion was made that all that they were trying to do is cancel the trademark registration. The question asked of the jury goes beyond trademark registration. It says, did they abandon the mark? So all rights to this mark will be lost as a result of this judgment if that is not excised. And if this were a case where it was just a mark that was out there, that might be an appropriate result, but it's not here. This case is very unlike the cases where abandonment has been found. As to the ruling excluding the evidence, in 2014 there was an opportunity to sell to a U.S. distributor, one of the largest U.S. distributors, and Allied jumped on that, and they were able to get a COLA right away. The COLA is in the record, and the COLA has Cowboy Little Barrel on it. You have to use the COLA. The Court may be familiar with the law of the TTB, but once the certificate of label approval has been approved, you have to use that down to the comments, down to the specific statements. And the COLA has the Cowboy on the front of this product, but it also has Cowboy Little Barrel on the back. The fact that it is a blended whiskey and not a bourbon is not relevant to the trademark analysis. I mean, this argument kind of sounds like a consumer protection case. This is a trademark infringement case. The trademark examiner found that whiskey and bourbon were sufficiently related that there was overlap. So this information was really, really important. The jury never heard that there were 90,000 bottles sold in 2014 with the Cowboy rebranded label that was approved with the U.S. COLA, and that's significant. That is clear evidence of not an intent to abandon, and this was underway during all the periods of time that we've been discussing. So in summary, we ask that the Court set aside the abandonment finding or at the very least find that the Court erred in excluding the evidence of the subsequent sales because there's no basis for it. It certainly was relevant, and it certainly would have made a difference. And going to your question, Your Honor, about was the Court aware of what the substance was, well, not only did the Court have a summary judgment full-blown affidavit that detailed all of this, but he declared a mistrial on the first trial on the basis of this very testimony. Because they didn't approach the bench. He had instructed them to approach the bench. Correct, but that was the testimony. He heard that testimony and declared the mistrial. That was only a month before this trial, and in this trial, counsel again approached the bench and the Court said, I'm not letting it in. I'm standing on that ruling. Thank you, Ms. Greer. The case is under submission. Next case, Ikekwere v. DuPont.